NIGHT BOX
FILED

MAR 13 1998

CARLOS JUENKE
CLERK, USDC / SDFL / FTL

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Pierce Division)

| | |
|---|---|
| CONNIE LYNNE MADRAY and MELODY HOLDEN, <br><br> Plaintiffs, <br><br> vs. <br><br> PUBLIX SUPERMARKETS, INC., a Florida corporation, <br><br> Defendant. | Case No. 96-14235-Civ-Roettger <br> Magistrate Judge Lynch <br><br><br><br><br> **Statement of Facts in Support of Plaintiffs' Responses to Motions for Summary Judgment** |

Plaintiffs, Connie Lynn Madray and Melody Holden, pursuant to Local Rule 7.5, hereby submit the following Statement of Facts in support of their Response to the Motion of Defendant Publix Super Markets, Inc. for Summary Judgment, served January 8, 1998, and the Motion of Defendant Ronald Selph for Summary Judgment and Supporting Memorandum of Law, served January 15, 1998.

### Statement of Facts

### Defendant Selph's sexual harassment of Plaintiffs

In their depositions, both Plaintiffs provided extensive and, to a surprising degree, unrebutted testimony regarding Selph's inappropriate behavior towards them and other female employees while Selph was the Manager of Store 118. *See generally,* Deposition of Melody Holden (hereafter "Holden depo."); Deposition of Connie Lynn Madray (hereafter Madray

1



Depo."); Deposition of Ronald Selph (hereafter "Selph depo.");[1] Statement of Undisputed Facts of Publix Supermarkets Inc., at 6-8 (discussing Plaintiffs allegations regarding Selph's offensive conduct). *See also* Defendant's Index, Exhibit 5, Plaintiffs EEOC Charges of Discrimination and Affidavits (discussing allegations); Exhibits 7 and 8, Plaintiffs Harassment Complaint Forms (discussing allegations)

Madray testified that Selph would regularly hug her in the morning when she arrived for work, and she recalls one morning where "he got real close to me and put his face in my hair like he was smelling my hair and kissed me on the cheek and said, "Good morning." Madray depo., at 135. When these incidents occurred, Madray would back up ands walk away from Selph without saying anything to him, and she Holden that these incidents made her feel sick. *Id.* at 136-37.

When Selph hugged Madray, it was "not in a way that was appropriate, that when he hugged me he would rub my back and then squeeze me where he felt everything . . . my breast." Madray depo., at 68, 151-53 (describing how when Selph first came to Store 118 his hugs were not initially offensive to Madray; it was not until Selph "started putting his arms around me, rubbing me and squeezing me tightly," that Madray considered such touching to be sexual harassment").

The unwanted touchings from Selph became especially bad in last two to three months before Plaintiffs were referred by Second Assistant Manager Gary Priest to District Manager Rhodes in August 1995. During this period, Selph became "more aggressive . . . hugging me tightly, rubbing himself against me. . . . it just escalated, and it got really bad towards the end."

---

[1] For the Court's reference, Plaintiffs have filed the complete transcripts of these three depositions. *See* Plaintiffs' Notice of Filing Depositions, dated March 13, 1998.

Madray depo., at 70. Madray also saw Selph hug Second Assistant Manager Darlene Clark and Deli Manager Lisa Fralix, but she never even saw him put his arm around a man. *Id.* at 111.

One time, after a one-on-one meeting where Selph announced that Madray had been given a raise, Madray was standing in the door of the back office, thanking him for her raise, when Selph walked quickly into the office, slammed the door and embraced her in a full-body hug in which he pressed his chest tightly against her breasts, saying "[i]t was well worth it." Madray depo., at 109-109. Although Selph was laughing when he hugged Madray, she did not find the incident amusing and she did not ask for the hug. She also felt that as a manager Selph he should have known better than to "touch anybody to start with." *Id.* at 110.

Selph would sometimes rub his body against Madray's as he reached for something on the top shelves in the office so that his genitals made contact with her back. Madray depo., at 114. Madray cried when she told her sister about this incident, and was told that Selph had done similar things to Holden. *Id.* at 118.

On one occasion, when Madray's husband suffered an abdominal injury that required surgery, Selph told her that if her husband "couldn't take care of her, he could . . .," which Madray took to mean that Selph "could take care of me sexually if my husband couldn't . . ." Madray depo., at 106-107. Selph was not laughing when he made the comment, not did Madray think he was kidding when he said it. *Id.* at 108. Selph also told Holden that he had made this comment to Madray. Holden depo., at 180.

When Selph gave Madray the invitation to her five year Publix breakfast, he told her to "be sure to wear something sexy because I'm going with you," Madray depo., at 122. He also told her on another occasion that she could not go to lunch at her scheduled time because she had

3

not flirted with him enough. *Id.* at 126-127. When discussing this incident with Pam Vasquez, Ms. Vasquez said something to the effect of "as long as you do for Mr. Selph, he'll do for you. That's just the way he is." *Id.* 127-128.

Selph would sometimes take it upon him self to straighten her necklace: "He'd use two hands to straighten my necklace, and he would blow in my ear." *Id.* at 126. Madray was offended by these unwanted contacts, and her body language in backing up and re-adjusting of her necklace showed Selph that she did not welcome the contact and was offended. Madray depo., at 142-43. These necklace-adjusting and ear blowing incidents occurred between five and ten times in the three month period leading up to August 1995, typically when Madray arrived for work early in the morning. Madray depo., at 144-46.

He would also motion to her for hugs as she would walk towards him in the store by putting his arms out, and would hug her regardless of whether she responded to his advances. *Id.* at 130. Notably, Madray recalls one such incident that was witnessed by Second Assistant Manger Gary Priest in August 1995 that led Mr. Priest to say "we need to go to Mr. Rhodes," since, in Mr. Priest's own words, "I've seen too much." *Id.* at 131, 133.

Madray felt that "because Selph had a management position, he felt he could do anything he wanted." *id.* at 71, and she was worried about possible negative consequences if she complained about Selph: "what would happen with my job, what would happen with my position, retaliation, people not treating me the same way they treated me before . . ." Madray depo, at 80. As the harassment became worse, she would cry on her way to work "because I didn't want to go in there, and then I would cry on the way home thanking God for helping me make it though another day." Madray depo., at 79. Madray and Holden were also unsure of

4

which manager to complain to under Publix's sexual harassment policy because "the manager that we needed to see was the one doing it. So we made a decision to go see Mr. Priest." Madray depo., at 88. This decision was based on the fact that fact that Plaintiffs felt comfortable with Mr. Priest and he was professional in his job. *Id.*

She was also concerned that Selph might make it hard on her if she complained by "picking on me about every little thing I did." *Id.* at 81. She also recalled that when another employee, Maria Chesser complained about Selph trying to spank her on her birthday in the store, "they didn't take it to the proper management and therefore it was taken care of in the store. [Selph] apologized, and he kept doing it." Madray depo., at 83.

Like Madray, Plaintiff Holden was not initially offended by Selph's behavior when he first became Manager of Store 118. Holden depo., at 55. During this period, her would just "put his hand around you, kind of pat you," and she thought he was just being friendly. Later, however, several months before District Manager Rhodes was contacted in 1995, she told Second Assistant Managers Darlene Clark and Gary Priest that "she didn't like it." Holden depo., at 56. According to Holden, "it was fine when he first started out and just out his hand around me and patted me on the shoulder. That's fine, but not where he would hug me and squeeze my breast up towards him or rub himself up against me in the back office. That is offensive." Holden depo., at 95.

According to Holden, Selph harassed her "in the computer room, the back office, the front office, on the floor, on the aisles and upstairs in the lounge." Holden depo., at 90.

He once came into the computer room, turned out the lights and said to Holden "ooh we're alone," after which he turned the lights on, came up behind Holden, and nibbled on her ear.

5

Holden depo., at 90-91. Holden told him to "quit it," moved away from him and quickly exited the room. This incident made Holden sick to her stomach, and she needed to go the bathroom to cry and get her thoughts together. *Id.* at 91-92.

On another occasion, when Holden had a sore throat, Selph stuck his tongue out at Holden and started wiggling it around, telling Holden he could fix her sore throat; in response, Holden told him he was "gross" and walked out of the room. Holden depo., at 96. Incidents like this at work made Holden "sick," and she would sometimes feel nauseated in the morning at the thought of having to work with Selph.

Just as he did to her sister, Selph would sometimes rub his body against Holden's as he reached for something on the top shelves in the office so that his genitals made contact with her back. Holden depo., at 99. He would also grab her tightly by the hips and brush up against her in the office. *Id.* at 101. On one occasion when Selph did this in front of Maria Chesser, Holden was so appalled that she had to go to the bathroom and cry. *Id.* at 101.

One time, when Holden, Selph and Pam Vasquez were in the office, Holden announced that she was tired. In response, Selph said he had something that could "wake her up," at which time he grabbed her "and kind of like dipped me, like in a dance, and then bit me on my neck. Although Selph may not have actually bitten her, Holden's neck was wet after the incident. Holden depo., at 103. When Vasquez saw the incident, she day. just laughed and said "yeah, I'm sure that will wake her up." *Id.* at 104. Another time, Vasquez suggested that Holden should give Selph a hug because he was in a bad mood that day. Holden depo., at 251.

On another occasion, Holden went to see Selph in the front office to ask him a question about e new flavor of ice cream. Selph responded that it was a "new Breyer's ice cream called

6

Romantica . . . and he asked me if I wanted to go upstairs and try some in his office." When Holden tried to avoid his insinuation by replying that she did not want any ice cream because it was fattening, Selph replied "Well, that's okay, I can work it off you." Holden depo., at 110. Holden was offended by the comment and left the office.

According to Holden, Selph would sometimes knock Plaintiff and other female employees over when they were on their knees stocking shelves by pushing them on their shoulders as he walked by. Holden depo., at 120-121.

Once, while Holden was working on the floor, Selph cam out of his office and gestured towards Holden while holding his hands in his hips and wiggling from side to side. When Holden asked what he wanted, Selph replied that he had "got it up" for Holden. Although he eventually said that he was referring to the fact that he had fixed an e-mail problem on Holden's computer, Holden felt the gesture was inappropriate. Holden depo., at 112-113.

Another time, just before Plaintiffs complaint to District Manager Rhodes in August 1995, Holden was joking with Selph about a work related matter involving Mr. Rhodes, when Selph suddenly "jumped up from his chair, grabbed me around the legs . . . and he out his face between my legs, but he had his face turned where his ear was like up towards my legs, and he was begging for my — for an apology for telling Mr. Rhodes on me." Because Holden was shocked by this behavior, she put her hand on Selph's shoulder, pushed him away from her and asked "what are you doing?" Holden depo., at 119.

Like Madray, Selph would also regularly hug Holden when she arrived for work in the morning. Holden depo., at 116. Holden also saw him doing this to her sister, but never to any male employees.

7

Bakery Manager David Neff witnessed some of Selph's harassment of Holden before Holden complained to Mr. Rhodes in August 1995. Holden depo., at 69-70. While Mr. Neff and Holden were in the back office, Selph came in, brushed Holden's hair out of her face and was going for her neck when Mr. Neff said to Selph, "that's sexual harassment." Holden depo. at 125-26. In response, Selph said "I don't care what you call it," to which Mr. Neff responded that he was offended. *Id.* at 126.

Second Assistant Manager Gary Priest also witnessed an incident in the manager's office where Selph was rubbing Holden's back and she was pressing against her computer in attempt to avoid his unwanted touching. Holden depo., at 127. When Mr. Priest asked Selph a question, Selph told him not to interrupt him when he was "hugging or touching a beautiful woman." *Id.;* *see also* Selph depo., at 109.

### Publix's knowledge of Selph's sexual harassment prior to August 1995

Although Publix would have the Court believe that Plaintiffs never complained to anyone about Selph's sexual harassment before contacting District Manager Richard Rhodes in August 1995, there is undisputed record evidence that Plaintiffs had brought Selph's sexually harassing behavior to several management-level employees with responsibility for handling such matters prior to contacting Mr. Rhodes.

Among the managers to whom it is undisputed that Plaintiffs complained were: Second Assistant Manager Darlene Clark, *see* Holden depo., at 56-59, Madray depo., at 219-220; Second Assistant Manager Gary Priest, *see* Holden depo., at 59-64; and Bakery Manager David Neff, *see* Holden depo., at 69-70. *See also* Defendant's Index, Exhibits 7 and 8, Plaintiffs Harassment Complaint Forms (identifying Clark, Priest and Neff as witnesses to harassment by Selph).

8

As noted above, both Holden and Holden Madray spoke with Ms. Clark about Mr. Selph's unwelcomed touchings between three and six months prior to contacting Mr. Rhodes. Holden depo., at 56-59; Madray depo., at 219-220. In response, Ms. Clark simply stated that Mr. Selph had done similar things to her as well, and at no time did she offer any assistance or suggestions to Plaintiffs. Holden depo., at 58-59; Madray depo., at 219-220. Because Ms. Clark was the Second Assistant Manager, Holden hoped that "she'd take it in her own hands and do it [i.e., take further action] because she's in management." *Id.* However, there is no evidence that Ms. Clark ever did anything to investigate the complaint or report it to higher management outside of Store 118.

Holden complained to Second Assistant Manager Gary Priest a month or two after she spoke with Ms. Clark. Holden depo., at 59-60. While socializing with Mr. Priest outside of work, she told him that Selph had grabbed her in the manager's office and kissed he on the neck. Ms. Clark was also present when Holden spoke with Mr. Priest. *Id.*, at 62-63. When Holden told Mr. Priest that she didn't know what to do about Selph's behavior, Mr. Priest seemed shocked, but did not offer any suggestions as to how she might pursue her complaint. *Id.* at 63.

As noted above, Bakery Manager David Neff had also witnessed some of Selph's harassment of Holden before Holden complained to Mr. Rhodes in August 1995. Holden depo., at 69-70; 244. While Mr. Neff and Holden were in the back office, Selph came in, brushed Holden's hair out of her face and was going for her neck when Mr. Neff said to Selph, "that's sexual harassment." Holden depo., at 125-26. In response, Selph said "I don't care what you call it," to which Mr. Neff responded that he was offended. *Id.* at 126. After Mr. Neff and Holden left the office, Mr. Neff asked Holden whether such behavior had occurred previously, to which

Holden replied yes. Holden told Mr. Neff that she hoped the harassment would stop "now that you said that to him," to which Mr. Neff replied, "[w]ell if it doesn't you let me know. And if it still continues, if you don't complain about it, then I have to as manager." *Id.*

Several months after Plaintiff Holden's initial conversation with Mr. Priest about her discomfort at being hugged and kissed by Mr. Selph, Mr. Priest himself witnessed an incident in the manager's office where Selph was rubbing Holden's back and she was pressing against her computer in attempt to avoid his unwanted touching. Holden depo., at 127. When Mr. Priest asked Selph a work-related question, Selph told him not to interrupt him when he was "hugging or touching a beautiful woman." *Id.; see also* Selph depo., at 109. Shortly after this incident, Mr. Priest contacted District Manager Rhodes to set up a meeting between Mr. Rhodes and Plaintiffs. Holden depo., at 129; Madray depo., at 156.

When Holden finally met with District Manager Rhodes in August 1995, Mr. Rhodes seemed very upset that he was never notified about her prior complaints about Selph, since "the managers knew better and should have let him know what was going on." Holden depo., at 132.

Finally, Selph admitted that he was the subject of another complaint of inappropriate behavior from a female subordinate before Plaintiffs contacted District Manager Rhodes in August 1995, wherein a young cashier named Maria Chesser alleged that Selph attempted to spank her in the manager's office by grabbing her and turning her over his knee. Selph depo., at 40-42, 117; Holden depo., at 63-67. Selph also freely admitted to blowing on the back of Ms. Chesser's neck, as well as licking his finger and sticking it in her ear. Selph depo., at 119.

Ms. Chesser complained about Selph's actions to Meat Manager Steve Pitts, who brought the incident to Selph's attention. *Id.* at 42; Selph depo., at 123. Ms. Chesser — who

10

occasionally dated Second Assistant Manager Gary Priest — also complained to deli manager Lisa Fralix about the spanking incident, which occurred about four months prior to Holden's complaint to District manager Rhodes in August 1995. Holden depo., at 64. Holden was pleased to hear of Ms. Chesser's complaint because she "thought it would stop" Selph's inappropriate conduct. *Id.* However, despite the fact that Selph eventually apologized to Ms. Chesser, he continued to hug and pinch Ms. Chesser even after the apology for the spanking incident. Holden depo., at 67.

### Defendant Selph's justification for his behavior towards Plaintiffs

In his deposition, Defendant Selph was questioned at length regarding the Plaintiffs' allegations that he sexually harassed them. Incredibly, Selph admitted hugging and kissing female employees, attempting to spank a female employee, and blowing in their ears. *Id.* at 18-19. Among the specific female employees he recalled hugging were both of the Plaintiffs, Maria Chesser, Second Assistant Manager Darlene Clark, and Deli Manager Lisa Fralix.[2] He claimed that he had engaged in such behavior because he "was trying to establish a family-type atmosphere at Publix that you could come to and have a good time and enjoy the work and want to be there." *Id; see also id.* at 85-86. Selph felt that his female employees "would do a better job if they enjoyed their work," and explained this philosophy as follows:

> my style of management was trying to do things in a joking manner and having a good time to where the people would feel like they belonged to a part of a family and weren't

---

[2] Although Selph at one point in his deposition claimed to hug all of his employees, he distinguished between the types of hugs he would give male and female employees: the "hugging" of male employees consisted of simply putting one arm around their shoulders, while the hugging of female employees involved encircling their shoulders with his arms and sometimes brushing up against their breasts in the process. Selph depo., at 94-96. Selph never hugged the male employees face-to-face as he did with the female employees. *Id.* at 96.

>just a number, per se, and would enjoy coming to work, and would want to work and know they could have fun at work while they were there.

*Id.*, at 20. Selph had no reason to believe that blowing in female employees' ears was inappropriate behavior for a store manager because "[t]here's nothing that would lead me to believe it was wrong. I was never told that they didn't want it." *Id.* at 21

Selph admitted that on more than one occasion, he rubbed Plaintiff Holden's back and massaged her shoulders in the cash-counting office and that he touched her on her hips and legs, Selph depo., at 70-73. He also recalled hugging both Plaintiffs and blowing in their ears, *id.* at 68-69, 91, and hugging and "dipping" Holden in the back room while they were having a discussion about dancing. *Id.* at 81. He agreed that he may have hugged Plaintiff Madray five to seven times a day. Selph depo., at 102. He also recalled the occasion on which he told Madray that she could not go to lunch because she "hadn't flirted enough today," claiming it was just a joke. *Id.* at 99-101.

These actions were part of his efforts to "build good morale and a family atmosphere" and perform his job as Store Manager at the highest possible level. Selph depo., at 69. Selph felt that raising morale would lead to higher employee productivity and higher profits for Publix, since "anytime you can make something better, its bound to increase your profits." Selph depo., at 69-70. Selph also testified that his bonuses as a Publix manager were based on the profitability of his store, and that he had received the highest bonuses of his Publix career while employed at Store 118. Selph depo., at 35-38.

### Publix's policy against sexual harassment

Publix's Statement Concerning Prohibited Harassment, Including Sexual Harassment broadly defines prohibited conduct as including the following:

12

1. Unwelcomed or unwanted advances, including sexual advances. ***This means patting, pinching, brushing up against, hugging, cornering, kissing, fondling, or any other similar physical contact.***

2. Unwelcomed requests or demands for sexual favors, including sexual favors. This includes subtle or blatant expectations, pressures for any type of favor, including sexual favor . . . whether or not it is accompanied by an implied or stated promise of preferential treatment or negative consequences concerning our employment status.

3. Verbal abuse or kidding that is oriented toward a prohibited form of harassment, including that which is sex oriented and considered unwelcomed. This includes comments about our . . . body and appearance, where such comments go beyond mere courtesy; telling jokes which have sexist . . . overtones which are unwanted or considered offensive, or any tasteless, sexually or other prohibited form of harassment oriented comments, innuendos or actions that offend.

4. Any type of sexually oriented conduct or other prohibited form of harassment that would unreasonably interfere with out work performance. This includes extending unwanted sexual attentions to someone whether or not it reduces that person's productivity or time available to work at assigned tasks.

5. ***Creating a work environment that is intimidating, hostile, abusive or offensive because of unwelcomed or unwanted*** conversations, suggestions, requests, demands, ***physical contacts or attentions, whether sexually or racially oriented or otherwise related to a prohibited form of harassment based on . . . sex.***

Madray Depo., Def. Exhibit 4-B; Defendant's Index, Exhibit 4. Publix's Rules of Unacceptable Conduct, also contained in the employee handbook, include prohibitions against "horseplay" and "intimidation, interference, disturbance or harassment of any associate, including but not limited to sexual harassment." Selph depo., Plaintiff's Exhibit 11.

Under Publix's policy, an employee who believes she is being subjected to unlawful sexual harassment is directed to bring the situation to the attention of "appropriate persons in Company Management." Among the persons identified in the policy as being an appropriate person in management are the Store Manager, i.e, Defendant Selph, the District Manager and Divisional Personnel Managers. In addition to the individuals specifically identified in the

policy, District Manager Rhodes told Plaintiffs during his investigation that the mangers to whom Plaintiff Holden had complained before coming to him in August 1995, i.e, Second Assistant Managers Darlene Clark and Gary Priest, and Bakery Manager David Neff, "knew better and should have let him know what was going on." Holden depo., at 132. It is also notable that the Harassment Complaint Form that Publix eventually provided to Plaintiffs also identifies and employees "Department Head" — a position lower than Store Manager — as someone with whom the employee should feel comfortable discussing sexual harassment. Defendant's Index, Exhibits 6 and 7 (Plaintiffs' Harassment Complaint Forms).

In addition to its policy against sexual harassment, and immediately preceding it in its employee handbook, Publix also has an "Open Door Policy," which states as follows: "[i]f something bothers you, or if you need clarification of a Publix policy or procedure, please talk to a manager about it. Remember, as a Publix associate, you can talk to *anyone in management*" (emphasis added). The Open Door Policy goes on to identify "your immediate Supervisor/Manager/Department Head" as appropriate persons with whom problems or questions can be discussed.

### Selph's uncertainty about the details of Publix's sexual harassment policy

In his deposition, Defendant Selph testified that — despite the fact that he was management-level employee of Publix identified in the sexual harassment policy as an appropriate person to which to complain about sexual harassment — he never "really had any per se training on sexual harassment." Selph depo., at 134. Although he vaguely recalled some meetings where the policy was discussed, he did not recall any meetings where Publix personnel explained to him the types of behavior that would violate its policy against sexual harassment,

14

nor did he recall ever receiving any corporate memos or e-mails explaining the policy. *Id.* Selph also did not understand the policy to include a prohibition against his touching, fondling, kissing or brushing up against subordinate employees. Selph depo., at 136. Moreover, when shown a copy of the policy, Mr. Selph could not recall ever seeing the policy in that form, *id.* at 140, nor did he have any idea of what to do as Store Manager if a sexual harassment complaint is brought to his attention. Selph depo., at 148. Indeed, Selph believed that he was not even permitted to handle a sexual harassment complaint involving his store and that his responsibility in such a situation was simply to report it to the District Manager.

Mr. Selph also testified as to his knowledge of Publix's Rules of Unacceptable Conduct. A Store Manager of Store 118, Mr. Selph was responsible for enforcing the Rules of Unacceptable Conduct. Selph depo., at 146. Despite his knowledge of these Rules, Selph did not consider it unacceptable conduct for him to blow in or lick the ears of his subordinate female employees.

### Publix's ineffective remedial measures against Selph

When Defendant Selph met with District Manager Rhoads in connection with the investigation of Plaintiffs' complaints of sexual harassment, Selph was told that he had been accused of hugging and kissing female employees in violation of Publix's rules of conduct. Selph depo., at 18, 25-26. Mr. Rhoads also asked Selph if he knew what sexual harassment was, and whether Selph was aware that Publix had a policy against sexual harassment. *Id.* at 29-31. During this meeting, which lasted approximately two to three hours, Mr. Rhoads also asked Selph to prepare a written response to the allegations. *Id.* at 32. Although Selph was not given specific instructions about what to include in the statement, Selph stated in his deposition that

"[w]e had just finished talking on some things, and he said that I needed to write a statement on what we had discussed." Selph depo., at 33.

In his statement, Selph admitted to hugging cashiers, rubbing their shoulders and pinching them on the elbows. Selph depo, at 128, Exhibit 8 (statement). He claimed, however, that his actions lacked any sexual intent, even though he was "not saying they could not have been taken that way." Exhibit 8, at 1. He also wrote that he never asked for sexual favors from any of his female employees and that if he had realized his actions were unwanted, he would have stopped. *Id.* Although Selph knew what the policy states, he felt that "sometimes we ignore policy when trying to make things better at work. This is the only thing I am really guilty of, not following policy ." *Id.* Selph closed his statement by explaining that "I really thought what I was doing was saying whatever happens, at work we care and want you to feel like you are apart [sic] of a family away from home." Id.

About a week after his face to face meeting with Mr. Rhoads at Store 118, Mr. Rhoads called Selph to inform him that he was being demoted to Assistant Manager and transferred to Store 61. Selph depo., at 27, 34.

While assigned to Store 61, Selph became the subject of yet another complaint of inappropriate behavior towards a female associate. In this incident, Terry English complained to the Store Manager that Selph had pinched her on the arm when she was helping him stock cereal on the shelves. *See* Selph depo., at 48-49, Exhibits 3, 4, and 5. The Store Manager then brought the incident to the attention of Mr. Copeland, the District Manager. Selph depo., at 46. Although Selph admits pinching Ms. English's arm, it was his understanding "that she was not complaining." *Id.* at 48.

Approximately two weeks after the incident with Ms. English, Selph retired from his employment with Publix. Selph depo., at 52-53.

Respectfully Submitted,

_____           (for) _____
Christopher C. Sharp                      Erika Deutsch Rotbart
Fla. Bar No. 996858                       Fla. Bar No. 047686
Christopher C. Sharp, P.A.                Rotbart & Deutsch, P.A.
1318 S.E. 1st Avenue                      21845 Powerline Road, Suite 201
Fort Lauderdale, Florida 33316            Boca Raton, Florida 33433
Telephone: (954) 728-9977                 Telephone: (561) 361-8010
Telecopier: (954) 763-4666                Telecopier: (561) 361-8086

Co-Counsel for Plaintiffs

Dated: March 13th, 1998

### Certificate of Service

I HEREBY CERTIFY that a true copy of the above and foregoing was served by mail this 13th day of March, 1998, upon the following counsel of record:

John Edward-Alley, Esq.                   William S. Reese, Esq.
Amy Littrell, Esq.                        Lane Reese et al.
Alley and Alley/Ford & Harrison LLP       Attorneys for Defendant Selph
Attorneys for Defendant Publix            2600 Douglas Road
205 Brush Street                          Suite 304
P.O. Box 1427                             Coral Gables, Florida 33134
Tampa, Florida 33601

_____
Christopher C. Sharp